Filed 6/18/26  Barnes v. LRS Healthcare CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| WILLIAM BARNES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LRS HEALTHCARE, LLC,<br><br>    Defendant and Appellant. | H053238<br>(Santa Clara County<br>Super. Ct. No. 23CV424794) |

This appeal is from the denial of a motion to compel arbitration.  William Barnes sued his former employer LRS Healthcare, LLC (LRS) claiming, on behalf of himself and a putative class of current and former LRS employees, various Labor Code and wage order violations.  LRS moved to compel arbitration and to dismiss the class action claims.  The trial court denied the motion on the ground that the agreements upon which the motion was based were unconscionable and unenforceable.  As explained below, we conclude that the trial court correctly held multiple provisions in the agreements unconscionable and did not abuse its discretion in refusing to sever these provisions.  Accordingly, we affirm the denial of LRS's motion to compel arbitration and to dismiss class action claims.

# I. BACKGROUND

LRS is an employment staffing agency that places medical professionals in temporary assignments at facilities throughout the country, including California. Barnes, a licensed nurse, worked for LRS as an hourly travel nurse starting in 2021. He performed assignments at several Bay Area hospitals before resigning in September 2023.

## A. The 2021-2022 Agreements

In November 2021, shortly before Barnes started his first assignment, LRS required him to review and sign numerous on-boarding documents, including new-hire documents, tax forms, LRS's employee handbook, paystubs, and an Agreement to Arbitrate (the 2021 Agreement to Arbitrate). LRS gave employees such as Barnes access to the onboarding documents via an online portal. The 2021 Agreement to Arbitrate accessible on that LRS portal was a standardized, pre-printed form, which Barnes had no opportunity to negotiate. In March 2022, Barnes also signed a document entitled "Traveling Medical Professional Services Agreement" (the 2022 Services Agreement).

### 1. The 2021 Agreement to Arbitrate

The 2021 Agreement to Arbitrate is four, single-spaced pages. In it, LRS and employees such as Barnes agreed to arbitrate all disputes "arising out of or in any manner related to your employment relationship," which "LRS may have against you [Barnes] or you may have against LRS, its affiliates, subsidiaries, divisions, predecessors, successors, assigns and their current and former employees, officers, directors, and agents." The agreement lists examples of claims covered by the arbitration requirement, all related to employment, and another list of matters not covered by the agreement. The agreement, however, states that it does not limit Barnes' ability to file charges with federal, state, or local administrative agencies or restrict the relief those agencies may seek in court.

The 2021 Arbitration Agreement also contains a waiver for class, collective, and representative actions. This provision states that "all disputes covered by the agreement must be pursued on an individual basis only" and that "you and LRS waive the right to commence, be a party to, participate in, receive money or any other relief from, or amend any existing lawsuit to include, any representative, collective or class proceeding or claims or to bring jointly any claim covered by this agreement." The provision further states that "neither you nor LRS may bring a claim covered by this agreement on behalf of other individuals or entities . . . ."

On its fourth and final page, the 2021 Agreement to Arbitrate contains a section entitled "Consideration," which states that, "[u]nless otherwise provided by applicable law, your employment or continued employment with LRS shall constitute consideration and acceptance by you of the terms and conditions set forth in this agreement." (Boldface omitted.) However, the next section, which is entitled "Opt Out," states that "[a]rbitration is not a mandatory condition of employment" and "[y]ou may opt out by mailing . . . written notice of the intent to opt out within 30 calendar days of signing this Agreement . . . ." (Boldface omitted.)

### 2. The 2022 Services Agreement

The 2022 Services Agreement is a five page, single-spaced document. Section 14 of this agreement required Barnes to abide by the 2021 Agreement to Arbitrate: "Professional hereby agrees that any potential disputes arising under this Agreement or any other aspect of Professional's employment with the Company, will be governed by and subject to the Company's Agreement to Arbitrate executed by Professional and Professional waives any right to object to same." Section 14 makes no provision for employees who may have opted out of the 2021 Agreement to Arbitrate.

The 2022 Services Agreement also contains a confidentiality provision and an injunctive relief provision. The confidentiality provision states that LRS will provide

3

Barnes with access to certain "Confidential Information," which is defined to include trade secrets, confidential and proprietary information owned by LRS as well as third-party information that LRS is required to maintain in confidence. The confidentiality provision also states that Barnes agrees not to disclose any Confidential Information.

Finally, the 2022 Services Agreement contains an injunctive relief provision. This provision allows LRS to seek injunctive relief as well as other remedies in court to enforce the confidentiality provision, and it requires Barnes to waive a key defense against injunctive relief. Specifically, the services agreement states that "Professional acknowledges there is no adequate remedy at law to redress a breach of the covenants contained in this Agreement and therefore agrees the Company shall be entitled to an injunction or other equitable relief against Professional restraining Professional from any such breach." The injunctive relief provision also states that Barnes "waives [his] right to pursue any claim or defense alleging that [LRS] has an adequate remedy at law for any breach." The provision additionally allows LRS to pursue damages and other remedies in court: "The Parties agree that nothing contained in this Agreement shall prohibit the Company from pursuing any other remedies including damages, through judicial proceedings or otherwise."

## B. The 2023 Agreements

In January 2023 Barnes signed two new agreements superseding the 2021-2022 agreements: the "Mutual Dispute Resolution Agreement" (2023 Dispute Resolution Agreement) and another "Traveling Medical Professional Services Agreement" (2023 Services Agreement). Like the 2021 Agreement to Arbitrate, the 2023 Dispute Resolution Agreement was accessible on the LRS portal as a standardized, pre-printed form.

### 1. *2023 Dispute Resolution Agreement*

The 2023 Dispute Resolution Agreement is six pages, two pages longer than the 2021 Agreement to Arbitrate. In addition, unlike the 2021 agreement, the 2023 agreement does not contain an opt-out provision. Instead, the first paragraph of the 2023 agreement states that "[t]his Agreement is a condition of employment," and "[i]f you accept or continue employment with LRS, both you and LRS will be bound by its terms."

The scope of the 2023 agreement to arbitrate is slightly broader than the 2021 agreement. While the 2021 agreement covers all disputes "arising out of or in any relationship to your employment relationship," the 2023 agreement covers "any controversy, dispute, or claim . . . relating to your employment *or association*." (Italics added.) Much like the 2021 agreement, the 2023 agreement requires arbitration of covered claims that (i) LRS has against Barnes, (ii) Barnes has against LRS, and (iii) Barnes has against "LRS' current or former affiliates, subsidiaries, divisions, predecessors, successors, assigns, parents, partners, members, vendors, clients, customers, or any entity alleged to be a joint employer with LRS, and LRS and/or their current and former employees, officers, directors, and agents." Like the 2021 agreement, the 2023 agreement also provides a long list of disputes covered by the agreement. One type of dispute listed is "individual claims under state private attorneys general laws (e.g., California Private Attorney General Act, California Labor Code §§ 2689, *et seq*.)."

Like the 2021 agreement, the 2023 agreement does not limit Barnes' ability to "file a charge with a federal, state or local administrative agency." However, in sharp contrast to the earlier agreement, the 2023 agreement imposes a limit on the monetary relief Barnes may recover in administrative proceedings: "[U]nless otherwise provided by applicable law, you shall not be entitled to seek or receive any monetary compensation as a result of any proceeding arising from the filing of any such charge and/or

participating in an investigation resulting from the filing of a charge with the EEOC and/or state or local human rights agency."

Like the 2021 agreement, the 2023 arbitration agreement contains a class, collective, and representative action waiver. However, this waiver recognizes that individual, or personal, representative claims may be brought: It states that claims covered by the 2023 agreement "must be pursued on an individual basis only and there is no right or authority for any Covered Claim to be brought, heard, or adjudicated as a multi-plaintiff, multi-claimant, class, collective, or representative action . . . ."

The 2023 Dispute Resolution Agreement also contains a severability provision stating that, "[i]f any part of this Agreement is held to be invalid void, or unenforceable, the remainder of the Agreement will still be enforceable." In addition, the 2023 agreement contains an integration clause, which states that the agreement "sets forth the final agreement of the parties and supersedes all prior negotiations, representations or agreements, whether written or oral, pertaining to arbitration of Covered Claims and waiver of jury trials." Finally, the agreement states that it "shall survive any termination of Employee's employment with the Company."

### 2. The 2023 Services Agreement

Several days after signing the 2023 Dispute Resolution Agreement, Barnes signed the 2023 Services Agreement. Like the 2022 Services Agreement, the 2023 agreement requires Barnes to arbitrate any dispute arising under the agreement or any other aspect of his employment with LRS. The agreement also prohibits Barnes from disclosing LRS trade secrets and other "Confidential Information." In addition, the agreement requires Barnes to acknowledge that "there is no adequate remedy at law to redress a breach of the covenants contained in this Agreement," that LRS is "entitled to an injunction or other equitable relief against Professional restraining Professional from any such breach," and that "nothing contained in this Agreement shall prohibit the Company from pursuing any

6

other remedies including damages, through judicial proceedings or otherwise." Finally, the 2023 Services Agreement states that "Professional hereby waives their right to pursue any claim or defense alleging that the Company has an adequate remedy at law for any breach."

## C. The Proceedings Below

### 1. The Claims

In October 2023, Barnes sued LRS. He asserted ten claims, including failure to pay for hours worked, to pay minimum wage, to pay overtime, to authorize or permit meal and rest breaks, and to reimburse necessary business expenditures. The meal and rest break claims seek civil penalties under California's Private Attorney General Act of 2004 (Lab. Code, § 2698 et seq.) (PAGA). Barnes also sought to certify a class of current and former employees.

### 2. LRS' Motion

LRS moved to compel Barnes to arbitrate his claims and to dismiss his class action claims. The motion was based on the 2023 Dispute Resolution Agreement, but LRS requested in the alternative, if that agreement is unenforceable, enforcement of the 2021 Agreement to Arbitrate. In opposition, Barnes argued that both agreements are unconscionable and unenforceable.

### 3. The Trial Court's Order

The trial court denied LRS's motion. Agreeing with Barnes, the court ruled that both the 2023 agreements and the 2021-2022 agreements are procedurally unconscionable and that they contain multiple substantively unconscionable provisions. The court also declined to sever the unconscionable provisions.

The trial court ruled that the 2023 Dispute Resolution Agreement had a "modest degree of procedurally unconscionability" because it is a contract of adhesion. The court also ruled that the 2023 agreements have a "considerable degree of substantive

unconscionability." In particular, the court held that the injunction provisions in the 2023 Services Agreement, which it held should be construed with the 2023 Dispute Resolution Agreement, are substantively unconscionable because they permit LRS to seek injunctive relief outside of arbitration to enforce the agreement's confidentiality provision and require Barnes to waive any defense that LRS had an adequate remedy at law. The trial court also found that the waivers of representative PAGA claims and monetary relief in administrative proceedings are substantively unconscionable. Finally, although the court did not find it problematic that the 2023 Dispute Resolution Agreement covered claims arising out of Barnes' "association" with LRS, it held the agreement's infinite duration substantively unconscionable. The trial court rejected LRS' request to sever the unconscionable provisions on the ground that these provisions "permeate" the 2023 agreements.

The trial court then considered the 2021-2022 agreements, reasoning that under the doctrine of novation those agreements become operative if the 2023 agreements superseding them are unenforceable. In light of the opt out provision in the 2021 Agreement to Arbitrate, the court found that the 2021-2022 agreements had "a slight degree of procedural unconscionability." In addition, concluding that the 2022 Services Agreement should be considered together with the 2021 Agreement to Arbitrate, the court held that the injunction provisions in the 2022 agreement are substantively unconscionable. It also held that the PAGA waiver in the 2021 agreement, which unlike the 2023 agreement waives all representative PAGA claims, whether individual or not, is substantively unconscionable. The court further held that the 2021 Agreement to Arbitrate's third-party provision, which it had not considered in connection with the 2023 agreements, is substantively unconscionable because it confers a benefit on LRS without conferring a similar one on Barnes. The trial court also once again declined to sever the unconscionable provisions.

8

Finally, the trial court declined to dismiss Barnes' class action claims.

LRS filed a timely notice of appeal from the trial court's order. We have jurisdiction over this appeal under Code of Civil Procedure section 1294, subdivision (a).

## II. DISCUSSION

"Federal and California law treat valid arbitration agreements like any other contract and favor their enforcement." (*Ramirez v. Charter Communications, Inc.* (2024) 16 Cal.5th 478, 492 (*Ramirez*).) Indeed, " 'the Legislature has expressed a "strong public policy" in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution." ' " (*OTO, LLC v. Kho* (2019) 8 Cal.5th 111, 125 (*OTO*).) Accordingly, under California as well as federal law, "[a]n agreement to submit disputes to arbitration 'is valid and irrevocable, save upon such grounds as exist for revocation of any contract.' " (*Ibid*; see 9 U.S.C. § 2.) "Unconscionability provides such grounds." (*Ramirez*, at p. 492.)

Where evidence is not in conflict, unconscionability rulings are reviewed de novo. (See, e.g., *Ramirez*, *supra*, 16 Cal.5th at p. 493.) However, a trial court's determination whether to sever unconscionable provisions from an agreement is reviewed for abuse of discretion. (*Id*. at p. 513.) Before applying these standards to the order on appeal, we briefly review the law governing unconscionability and severance.

### A. Relevant Legal Principles

"A contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party." (*OTO*, *supra*, 8 Cal.5th at p. 125.) "[U]nconscionability doctrine ' "has both a procedural and a substantive element." ' " (*Ibid*.) Both elements must be shown to establish the defense, but they do not need to be present in the same degree; to the contrary, procedural and substantive unconscionability operate on a " 'sliding scale' ":

9

The more one is shown, the less the other is required. (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114 (*Armendariz*).)

### 1. *Procedural Unconscionability*

Procedural unconscionability examines " 'the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power.' " (*Ramirez*, *supra*, 16 Cal.5th at p. 492.) " ' " 'Oppression' " ' " exists where a contract " ' " 'involves lack of negotiation and meaningful choice . . . .' " ' " (*OTO*, *supra*, 8 Cal.5th at p. 126.) " ' " '[S]urprise' " ' " occurs when the allegedly unconscionable provision is " ' " 'hidden within a prolix printed form.' " ' " (*Id.* at p. 126.)

Analysis of procedural unconscionability " 'begins with an inquiry into whether the contract is one of adhesion.' " (*OTO*, *supra*, 8 Cal.5th at p. 126.) "An adhesive contract is standardized, generally on a preprinted form, and offered by the party with superior bargaining power 'on a take-it-or-leave-it basis.' " (*Id.* at p. 126.) Because of the economic pressure that employers exert on most employees (*id.* at p. 127), "[a]rbitration contracts imposed as a condition of employment are typically adhesive" (*id.* at p. 126), and "[a]n arbitration agreement that is an essential part of a 'take it or leave it' employment condition, without more, is procedurally unconscionable" (*Martinez v. Master Protection Corp.* (2004) 118 Cal.App.4th 107, 114).

While, by itself, a contract of adhesion concerning employment establishes " 'a modest degree of procedural unconscionability' " (*Nguyen v. Applied Medical Resources Corp.* (2016) 4 Cal.App.5th 232, 248 (*Nguyen*)), other factors may increase the degree of unconscionability. For example, the pressure on an employee to sign an agreement can be substantial if the employee must do so to keep a job because " 'the sudden loss of a job may create major disruptions . . . .' " (*Beco v. Fast Auto Loans, Inc.* (2022) 86 Cal.App.5th 292, 309 (*Beco*).) Procedural unconscionability also may be increased by

10

factors such as the length of a contract, the length and complexity of the contract's provisions, the education and experience of a party, and the absence of legal assistance. (*Id*. at p. 308.)

### 2. *Substantive Unconscionability*

Substantive unconscionability "considers 'the fairness of an agreement's actual terms' [citation], focusing on whether the contract will create unfair or one-sided results [citation]." (*Ramirez*, *supra*, 16 Cal.5th at p. 493.) Contractual provisions are substantively unconscionable if they are " 'overly harsh,' " " ' "unduly oppressive," ' " or " ' " 'so one-sided as to "shock the conscience." ' " ' " (*Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, 1244 (*Baltazar*).) Unconscionability doctrine is not concerned with bad bargains, " 'but with terms that are "unreasonably favorable to the more powerful party." ' " (*Id*. at p. 1244.) Consequently, with respect to substantive unconscionability, " '[t]he ultimate . . . issue is whether the terms of the contract are sufficiently unfair, in view of all the circumstances, that a court should withhold enforcement.' " (*Ibid*.)

A contract may be unreasonably favorable to the more powerful party, and therefore substantively unconscionable, if it lacks "mutuality." Mutuality is absent, for example, when a party with stronger bargaining power requires a weaker party to arbitrate claims but does not require the stronger party to arbitrate the claims that party is likely to bring against the weaker party. (*Ramirez*, *supra*, 16 Cal.5th at pp. 495-496.) Provisions lacking mutuality are substantively unconscionable unless the stronger party provides "some reasonable justification for such one-sidedness based on 'business realities.' " (*Id.* at p. 495.)

### 3. *Severance*

When a contractual provision is held unconscionable, a trial court has to choose to do one of the three things: "(1) refuse to enforce the contract; (2) sever any

unconscionable clause; or (3) limit the application of any clause to avoid unconscionable results." (*Ramirez*, *supra*, 16 Cal.5th at p. 513 [discussing Civ. Code, § 1670.5].) However, "[t]he 'strong legislative and judicial preference is to sever the offending term and enforce the balance of the agreement' " (*ibid*.), especially when the contract in question contains a severance clause expressing an intent that the contract should be enforced where its invalidity may be cured by removing terms (*id.* at p. 517).

In determining whether unconscionable contractual terms should be severed, courts first determine whether the unconscionability can be cured by removing or limiting terms. (*Ramirez*, *supra*, 16 Cal.5th at p. 516.) If not, severance should be denied. (*Ibid*.) If the unconscionability is curable, courts consider whether " ' " 'the interests of justice . . . would be furthered' by severance.' "' ' " (*Id*. at p. 514.)

In determining whether the interests of justice favor severance, several competing factors should be considered. On the one hand, the interests of justice may favor severance of unconscionable terms " 'to conserve a contractual relationship' "or " 'to prevent parties from gaining undeserved benefit or suffering undeserved detriment' " caused by voiding the entire contract. (*Ramirez*, *supra*, 16 Cal.5th at p. 514.) On the other hand, the interests of justice may disfavor severance if an arbitration agreement is " 'permeated by an unlawful purpose,' " for example, because multiple defects in the agreement evidence a " 'systematic effort' " to gain an unfair advantage. (*Id*. at p. 515.) In that situation, severance does not further the interests of justice because preserving the arbitration agreement would " 'create an incentive for an employer to draft a one-sided arbitration agreement in the hope employees would not challenge the unlawful provisions, but if they do, the court would simply modify the agreement to include the bilateral terms the employer should have included in the first place.' " (*Id*. at p. 517.) As a general rule, "the greater number of unconscionable provisions a contract contains the less likely that severance will be the appropriate remedy." (*Ibid*.)

12

## B. The 2023 Agreements

We begin with the 2023 Dispute Resolution Agreement and the 2023 Services Agreement. Because the two agreements were executed within days of each other, concern Barnes' continued employment, and address dispute resolution, the parties agree that they should be construed together. This reflects the general principle that "[s]everal contracts relating to the same matters, between the same parties, and made as part of substantially one transaction, are to be taken together." (Civ. Code, § 1642; see also *Alberto v. Cambrian Homecare* (2023) 91 Cal.App.5th 482, 490-491 (*Alberto*) [considering arbitration and confidentiality agreements together because they create an "overall dispute resolution process"].) Accordingly, we consider the 2023 agreements together in determining whether they were procedurally and substantively unconscionable.

### 1. Procedural Unconscionability

The trial court concluded that the 2023 Dispute Resolution Agreement had a "modest amount" of procedural unconscionability because it was a contract of adhesion. We agree that the 2023 Dispute Resolution Agreement is a contract of adhesion and conclude that 2023 Services Agreement is one as well. Moreover, we find additional aspects of procedural unconscionability. As a consequence, we conclude that the 2023 agreements have a moderate level of procedural unconscionability.

The 2023 agreements are clearly contracts of adhesion. As noted above, a contract of adhesion is "standardized, generally on a preprinted from, and offered by the party with superior bargaining power 'on a take-it-or-leave-it basis.' " (*OTO*, *supra*, 8 Cal.5th at p. 126.) The 2023 agreements fit the bill. Both the 2023 Dispute Resolution Agreement and the 2023 Services Agreements are on standardized, pre-printed forms. The agreements were offered by LRS, Barnes' employer, who was in a position to place economic pressure—potential loss of employment—on Barnes. (*Ramirez*, *supra*, 16

13

Cal.5th at p. 494; *OTO*, at p. 127.) And LRS expressly made the 2023 Dispute Resolution Agreement "a condition of employment" and provided no opt out. In addition, the 2023 Services Agreement requires Barnes to agree to the other 2023 agreements' arbitration provision. Consequently, as the trial court concluded, the 2023 agreements are contracts of adhesion and therefore both impose at least a " 'modest degree of procedural unconscionability.' " (*Nguyen*, *supra*, 4 Cal.App.5th at p. 248.)

Barnes argues that additional factors heighten the procedural unconscionability. We agree. First, the 2023 Dispute Resolution Agreement is a full six pages, single-spaced long, and although it used a conventional type size, it was filled with references to state and federal statutes as well as legal terminology and requirements—which contributes to procedural unconscionability. (*Beco*, *supra*, 86 Cal.App.5th at p. 308.) Second, Barnes has no legal training and did not have the assistance of a lawyer, another factor that contributes to procedural unconscionability. (*Ibid*. [noting that plaintiff was not "legally sophisticated" and his review of arbitration agreement "was not aided by an attorney"].) Third, the 2023 agreements were presented to Barnes after years working for LRS as a condition of continued employment, which imposed substantial pressure upon him to accept them. (*OTO*, *supra*, 8 Cal.5th at p. 127 ["[E]conomic pressure can also be substantial when employees are required to accept an arbitration agreement in order to *keep* their job."].)

LRS acknowledges that the 2023 Dispute Resolution Agreement is a contract of adhesion. Nevertheless, it asserts that the agreement had only a "slight" degree of procedural unconscionability because there was no oppression or surprise. We are not persuaded. LRS does not dispute that Barnes' continued employment was conditioned upon acceptance of the 2023 Dispute Resolution Agreement. Nor does it contend that Barnes had any legal training or was able to consult with an attorney. And, far from showing that the agreement was easily understood by lay persons, LRS merely asserts

14

that it was "short, plainly written, and organized" because "it defines 'Covered Claims,' lists examples, defines 'Excluded Claims,' and contains a severability clause."

Accordingly, we conclude that the 2023 agreements impose a moderate level of procedural unconscionability.

### 2. *Substantive Unconscionability*

The trial court concluded that that the 2023 agreements imposed a considerable degree of substantial unconscionability because four provisions—the service agreement's injunction provision and the dispute resolution agreement's PAGA waiver, administrative monetary relief waiver, and duration—are substantively unconscionable. Barnes agrees with these conclusions and contends the dispute resolution agreement's scope is also substantively unconscionable. Although we disagree with respect to the dispute resolution agreement's duration, we otherwise agree with the trial court and therefore conclude that the 2023 agreement has a high degree of substantive unconscionability.

#### a. The Injunction Provision

The trial court began its analysis of the 2023 agreements with the 2023 Services Agreement's injunction provision, which it found unconscionable because it requires Barnes to consent to injunctive relief outside of arbitration for breaches of confidentiality, a claim that only LRS could make, and requires Barnes to waive an essential requirement for injunctive relief. We agree that the injunction provision is substantively unconscionable.

" ' "[T]he paramount consideration in assessing . . . conscionability is mutuality." ' " (*Alberto*, *supra*, 91 Cal.App.5th at p. 491.) "An arbitration agreement need not 'mandate the arbitration of all claims between' the parties." (*Ramirez*, *supra*, 16 Cal.5th at p. 495.) "However, if an agreement singles out certain claims for arbitration, there must be 'mutuality.' " (*Ibid*.) "[I]t is unfairly one-sided for an employer with superior bargaining power to impose arbitration on the employee as plaintiff but not to

15

accept such limitations when it seeks to prosecute a claim against the employee, without at least some reasonable justification for such one-sidedness based on 'business realities.' " (*Armendariz*, *supra*, 24 Cal.4th at p. 117.)

The 2023 Services Agreement is substantively unconscionable because it lacks mutuality without justification. The agreement prohibits employees from disclosing "Confidential Information," which is defined broadly to include all trade secrets, confidential information, and proprietary information owned by LRS as well as any third-party information LRS is obligated to maintain in confidence. In addition, the agreement provides that LRS may seek an injunction or any other remedy, not in or even in conjunction with arbitration, but instead "through judicial proceedings." Moreover, the agreement requires employees to "acknowledge[] that there is no adequate remedy at law" to redress a breach of the agreement and to "waive[]" any defense against injunctive relief that LRS "has an adequate remedy at law."

This provision is one-sided and unfair. It concerns procedural requirements that no lay person is likely to understand, much less appreciate their significance. It gives LRS the right to seek injunctive relief and other remedies, including damages, in court against Barnes on claims arising out of his employment and association with LRS even though Barnes is required to arbitrate such claims that he has against LRS. In addition, by requiring Barnes to acknowledge there is no adequate remedy at law and waive any defense on that ground, the injunction provision allows LRS to obtain injunctive relief without establishing an essential requirement for such relief. While there may be a reasonable business justification for imposing a duty of confidentiality on employees and even for allowing some injunctive relief in court, LRS has not suggested any such justification for relieving it of the need to establish a basic requirement for injunctive relief and also allowing it to seek "other remedies including damages" in court.

16

Similar provisions have been held unconscionable. In *Alberto v. Cambrian Homecare*, *supra*, 91 Cal.App.5th 482, an employer required employees to sign both an arbitration agreement requiring the employees to arbitrate all claims arising out of their employment and a confidentiality agreement. (*Id*. at p. 486.) The confidentiality agreement required employees to acknowledge that unauthorized disclosure of confidential information " 'would cause irreparable injury' " to the employer and also required employees to consent to " 'an immediate injunction, without bond, from any court of competent jurisdiction.' " (*Id*. at p. 487.) *Alberto* held these provisions substantively unconscionable. (*Id*. at pp. 492-493.) The decision reasoned that, while provisions allowing preliminary injunctive relief may not be automatically unconscionable, the "additional provisions that waive the employer's need to obtain a bond before seeking an injunction, waive the employee's need to show irreparable harm, and require an employee to consent to an immediate injunction are unconscionable." (*Id*. at p. 492.) Similarly, *Carbajal v. CWPSC, Inc*. (2016) 245 Cal.App.4th 227 (*Carbajal*), held that "[a]n arbitration provision lacks mutuality and is substantively unconscionable when it authorizes the stronger party to obtain injunctive relief without establishing all of the essential elements for the issuance of an injunction." (*Id.* at p. 250; see also *Carmona v. Lincon Millennium Car Wash, Inc*. (2014) 226 Cal.App.4th 74, 86-90 [holding unconscionable provision allowing employers to seek injunction or damages for breach of confidentiality agreement in court].)

LRS notes that California law expressly permits parties to seek provisional remedies in court (Code Civ. Proc., § 1281.8) and that the Supreme Court has held that provisions permitting preliminary injunctive relief are therefore not automatically unconscionable (see *Baltazar*, *supra*, 62 Cal.4th at pp. 1246-1248). However, the 2023 Services Agreement is not limited to provisional remedies or to remedies in "aid of arbitration." To the contrary, it authorizes LRS to seek permanent injunctive relief as

17

well as "any other remedies, including damages," and to do so in court without any arbitration. Moreover, while *Alberto* expressly recognized that preliminary injunctive relief provisions are "not, by themselves, unconscionable," it also held that provisions relieving employers of the need to prove essential requirements for injunctive relief—as the 2023 Services Agreement does—are unfair and unconscionable. (*Alberto*, *supra*, 91 Cal.App.5th at p. 492.) Finally, far from implicitly overruling *Carbajal* as LRS asserts, the Supreme Court noted that the decision is "instructive" in holding an injunction provision unconscionable. (*Ramirez*, *supra*, 16 Cal.5th at pp. 499-500.

Accordingly, we conclude that the 2023 Services Agreement's injunctive relief provision is "blatantly one-sided" and creates a "moderate level of substantive unconscionability." (*Carbajal*, *supra*, 245 Cal.App.4th at pp. 249, 253.)

### b. The PAGA Waiver

In addition to holding the 2023 Service Agreement's injunction provision substantively unconscionable, the trial court held the waiver of PAGA claims in the 2023 Dispute Resolution Agreement substantively unconscionable. Here again, we agree.

The 2023 Dispute Resolution Agreement contains a "Class Waiver" that precludes PAGA claims for violations involving others and waives any monetary recovery or other relief from such claims. (Boldface omitted.) The waiver states that Covered Claims "must be pursued on an individual basis only" and cannot be "brought, heard, or adjudicated as a multi-plaintiff, multi-claimant, class, collective, or representative action, or . . . proceeding." The waiver also states that, to the maximum extent permitted by law, "you and LRS waive the right . . . to participate in" or "receive money, or any other relief" from any representative, collective or class proceeding involving a claim covered by the 2023 Dispute Resolution Agreement. Finally, the waiver prevents an arbitrator or court from combining individual claims, facilitating the production of class-wide contact information, or arbitrating any class, collective, or representative proceeding.

18

Although the Federal Arbitration Act (9 U.S.C. § 1 et seq.) (FAA) permits arbitration agreements to include class action waivers (see *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 340, 352) and to require arbitration of PAGA claims (see *Viking River Cruises, Inc. v. Moriana* (2022) 596 U.S. 639, 663 (*Viking River*)), the FAA does not preempt California law prohibiting waiver of the right to bring PAGA claims at all (*id*. at p. 661; see also *id*. at p. 653 [" ' "[B]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute . . . ." ' "]). Moreover, our Supreme Court has held that an employee's right to bring PAGA claims is unwaivable because PAGA was "established for a public reason"—to augment the limited enforcement capability of the Labor and Workforce Development Agency—and "requiring the waiver of PAGA rights would harm the state's interests in enforcing the Labor Code." (*Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 383 (*Iskanian*), overruled on other grounds *Viking River*, *supra*, 596 U.S. at pp. 661-663).) Accordingly, if "an employment agreement compels the waiver of representative claims under the PAGA, it is contrary to public policy and unenforceable as a matter of state law." (*Id*. at p. 384; see also Civ. Code, § 3513 ["Any one may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by private agreement."].)

LRS points out that, contrary to the trial court's assumption, the 2023 Dispute Resolution Agreement does not contain a "blanket waiver" of the right to bring PAGA actions because it permits arbitration of PAGA claims brought by employees concerning Labor Code violations they personally suffered. LRS is correct that the agreement provides for arbitration of individual PAGA claims concerning Labor Code violations personally suffered. However, this fact does not save the PAGA waiver. Even if the agreement permits Barnes to bring individual PAGA claims, it still prohibits him from bringing claims concerning Labor Code violations suffered by others and therefore

19

interferes with the purpose for which PAGA was established: "to augment the limited enforcement capacity of the [Labor and Workforce Development] Agency." (*Iskanian*, *supra*, 59 Cal.4th at p. 383.) Accordingly, even where employees are permitted to assert individual PAGA claims, a prohibition against "asserting any nonindividual PAGA claims" is contrary to public policy, invalid, and unconscionable. (*Gregg v. Uber Technologies, Inc*. (2023) 89 Cal.App.5th 786, 797; see also *Adolph v. Uber Technologies, Inc*. (2023) 14 Cal.5th 1104, 1126 ["*Viking River* left intact *Iskanian*'s rule against agreements that compel waiver of *non-individual* claims," italics added].)

LRS asserts that the 2023 Dispute Resolution Agreement has a savings clause in the excluded claims section of the agreement. LRS appears to be referring to a provision excluding from arbitration "claims which, after application of the FAA and FAA preemption principles, are not subject to arbitration or pre-dispute arbitration agreements." However, LRS only vaguely asserts that the savings clause "creates an ambiguity that must be resolved [by] adopting the reading that leaves it lawful" and does not explain how the PAGA waiver implicates the FAA and FAA preemption principles. Vague and conclusory argument is inadequate. (See, e.g., *People v. Williams* (1997) 16 Cal.4th 153. 206 (*Williams*) ["Points 'perfunctorily asserted without argument in support' are not properly raised."]; see also *In re S.C.* (2006) 138 Cal.App.4th 396, 408 (*S.C.*) ["To demonstrate error, appellant must present meaningful legal analysis . . . ."].) In any event, a savings clause does not render an unfair, one-sided provision in an employment agreement conscionable for the simple reason that "the employee would have no way of knowing what would be covered or not covered by this provision." (*Hasty v. American Automobile Assn. of Northern California* (2023) 98 Cal.App.5th 1041, 1062 (*Hasty*).)

We therefore conclude that the 2023 Dispute Resolution's PAGA waiver provision is both invalid and substantively unconscionable.

c.  The Administrative Monetary Relief Waiver

The 2023 Dispute Resolution Agreement also contains a provision requiring employees to waive any monetary relief from federal, state, or local administrative proceedings.  The trial court held that this provision is substantively unconscionable and, indeed, "shocks the conscience."  Here, too, we agree.

Towards the end of the section defining the scope of arbitration, the 2023 Dispute Resolution Agreement contains a provision unrelated to arbitration.  This provision states that "you shall not be entitled to seek or receive any monetary compensation" as a result of filing charges with a federal, state, or local administrative agency or participating in any investigation by the Equal Employment Opportunity Commission or a state or local human rights agency.  Because this waiver restricts employees, it is one-sided and only benefits LRS.  In addition, because it has nothing to do with arbitration, this waiver is also unexpected and harsh.  *Hasty*, *supra*, 98 Cal.App.4th 1041 considered a similar provision waiving the right to any remedy or relief from charges or complaints brought by administrative agencies.  (*Id*. at p. 1060.)  *Hasty* held that such "[a] waiver of administrative remedies and relief, hidden in an arbitration agreement, is overly harsh and shocks the conscience."  (*Ibid*.)  The waiver here, which is also hidden, is similarly overly harsh and shocking.

LRS contends that *Hasty* is distinguishable because the waiver in that case covered all remedies and relief.  While that is true, the waiver in that case also applied to both parties (*Hasty*, *supra*, 98 Cal.App.5th at p. 1060), whereas the waiver in the 2023 Dispute Resolution Agreement applies only to employees and, thus, is expressly one-sided.  Even more important, LRS does not identify what relief besides monetary compensation was waived in *Hasty*, much less show that other relief was more important.  Nor does LRS offer any reasonable justification for the one-sided waiver of administrative monetary

21

relief.  As a consequence, LRS fails to show why this waiver is any less shocking and unfair than the waiver in *Hasty*.

LRS also asserts that "[w]aiving a legal right one does not actually have does not give an employer any 'greater benefit.' "  However, it fails to identify the legal right it is referencing, much less explain why Barnes does not have it.  As a consequence, this argument is inadequate.  (*Williams¸ supra*, 16 Cal.4th at p. 206; *S.C., supra*, 138 Cal.App.4th at p. 480.)  Finally, LRS notes that the administrative monetary relief waiver applies only "unless otherwise provided by applicable law."  However, it again fails to explain what law might invalidate the waiver, and, in any event, as previously noted, such a savings clause does not make an unconscionable provision fair because an employee "would have no way of knowing what would be covered or not covered by this provision."  (*Hasty, supra*, 98 Cal.App.5th at p. 1062.)  Moreover, if, as LRS seemed to suggest at oral argument, the administrative monetary relief waiver does not apply to any administrative monetary relief to which an employee is entitled, the waiver has no legitimate purpose and serves only to deter unsophisticated employees from seeking monetary relief to which they are entitled.

We therefore conclude that the administrative waiver provision shocks the conscience and is substantively unconscionable.

### d.  The Scope, Duration, and Third-Party Provisions

In addition to arguing that the injunction provisions of the 2023 Services Agreement and that the PAGA and administrative monetary relief waivers in the 2023 Dispute Resolution Agreement are unconscionable, Barnes argues that the scope and the duration of the latter agreement are unconscionable as well.  The trial court held that the duration, but not the scope, of the agreement is unconscionable.  We do not agree that the agreement's duration is unconscionable.  However, another portion of the 2023 Dispute Resolution Agreement—the third-party provision—is unconscionable.

Barnes argues that the 2023 Dispute Resolution Agreement is unconscionably overbroad because it covers claims "relating to your employment *or association* with LRS." (Italics added.) Reasoning that the subject matter of the agreement was "not problematic," the trial court disagreed with Barnes. We do as well. While the 2023 Dispute Resolution Agreement requires arbitration of claims relating to Barnes' association with LRS in addition to his employment, there is no reason to believe that his association with LRS, an employment staffing agency, extends significantly beyond employment. Moreover, the resulting scope of the 2023 Dispute Resolution Agreement is a far cry from the agreement covering " 'all claims, whether or not arising out of . . . employment' " considered in *Cook v. University of Southern California* (2024) 102 Cal.App.5th 312, 321 (*Cook*), or the agreement covering "any claim that the Company has against me or that I have against the Company . . . including but not limited to claims arising and/or relating in any way to my hiring, my employment, or association with the Company" considered in *Cocom v. AMB Aviation, Inc*. (C.D. Cal. Dec. 27, 2024) 2024 WL 5701894, *2. As a consequence, we agree with the trial court that the scope of the 2023 arbitration agreement is not problematic.

However, we disagree with the trial court concerning the agreement's duration. Relying on *Cook*, the trial court ruled that the duration provision, which states that the agreement "shall survive any termination of Employee's employment with the Company," is unconscionable. The arbitration agreement considered in *Cook* similarly stated that the agreement would " 'survive the termination of Employee's employment, and may only be revoked or modified in a written document that expressly refers to the "*Agreement* to Arbitrate Claims" and is signed by the President of the University.' " (*Cook, supra*, 102 Cal.App.5th at p. 325 (italics added).) However, the employer in *Cook* was the University of Southern California, an entity that frequently has contact with non-employees. The arbitration agreement in that case also covered " 'all claims, whether or

23

not arising out of Employee's University employment, remuneration, or termination, that Employee may have against the University.' " (*Id*. at p. 321.) Consequently, if that arbitration agreement were of infinite duration, it could apply unexpectedly, for example, should the ex-employee become " 'the victim of a botched surgery in a USC hospital in 15 years.' " (*Id.* at p. 318.) There is no similar danger with LRS and therefore no reason to conclude that the duration provision in the 2023 Dispute Resolution Agreement is overly harsh or unreasonably favorable to LRS.

However, the agreement contains another substantively unconscionable provision: the third-party provision, which the trial court considered in connection with the 2021 agreement but not the 2023 agreement.

The 2023 Dispute Resolution Agreement covers claims that "(i) LRS has against you [Barnes], (ii) you have against LRS, or (iii) you have against LRS' current or former affiliates, subsidiaries, divisions, predecessors, successors, assigns, parents, partners, members, vendors, clients, customers, or any entity alleged to be a joint employer with LRS, and LRS and/or their current and former employees, officers, directors, and agents." Thus, the 2023 agreement requires Barnes to arbitrate not only covered claims against LRS, but also covered claims against, among others, LRS's affiliates and other third parties designated by LRS. However, the agreement does not require those third parties to arbitrate any claims against Barnes. *Cook* considered a provision similarly requiring an employee to arbitrate claims against entities related to her employer but not requiring those related entities to arbitrate claims against the employee. (*Cook*, *supra*, 102 Cal.App.5th at p. 317.) *Cook* held that this provision unfairly "confers a benefit on [the employer] and its broadly defined 'related entities' that is not mutually afforded" the employee. (*Id.* at p. 327.) Moreover, because the employer "offered no justification for this one-sided treatment," *Cook* held the provision "substantively unconscionable for lack of mutuality." (*Id.* at p. 328.)

24

Although LRS argues *Cook* is distinguishable, it does not offer any business justification for the one-sided treatment of the third parties designated by LRS. Instead, LRS argues that *Cook* is distinguishable because the arbitration agreement in this case is limited to disputes arising out of its employment relationship with Barnes. In fact, as noted above, the agreement is broader and covers claims arising out of Barnes' association with LRS as well as his employment. Even more important, while *Cook* mentioned the broad scope of the arbitration agreement at issue in discussing the third-party provision in that case, it did not stress the scope or otherwise suggest that its unconscionability holding depended on that scope. (*Cook*, *supra*, 102 Cal.App.5th at pp. 326-328.)

LRS also asserts the third-party provision is not unconscionable because, even if not named in an arbitration provision, third parties connected to an employer can compel arbitration of covered claims against them based on equitable estoppel principles. While that is true, the 2023 Dispute Resolution Agreement's third-party provision relieves the designated parties of the need to satisfy those principles and thus increases the likelihood that claims against those parties will be arbitrated. Finally, at oral argument LRS asserted that the third parties designated in the agreement are unlikely to have many claims against Barnes and other employees based on their employment and association with LRS. While that may be true, it merely reduces the degree of substantive unconscionability.

We therefore conclude that the third-party provision in 2023 Dispute Resolution Agreement lacks mutuality and is substantively unconscionable.

### 3. *Enforceability*

Because the 2023 agreements are moderately procedurally unconscionable, under the sliding scale for unconscionability only a moderate degree of substantive unconscionability is needed to render the agreement's provisions unconscionable. (See,

25

e.g., *Carbajal*, *supra*, 245 Cal.App.4th at p. 253.) This requirement is satisfied. The one-sided injunction provision in the 2023 Services Agreement permitting LRS to seek injunctive relief in court and requiring Barnes to waive an essential requirement for such relief has at least a moderate level of substantive unconscionability. (See *Carbajal*, *supra*, 245 Cal.App.4th at pp. 249, 253; but see *Alberto*, *supra*, 91 Cal.App.5th at p. 495 [holding "nonmutual confidentiality injunction provisions" had a "high degree of substantive unconscionability"].) The unlawful and invalid PAGA waiver in the 2023 Dispute Resolution Agreement has a "high degree of substantive unconscionability" (*Alberto*, at p. 496), and the agreement's restriction on monetary administrative relief for which LRS failed to offer any justification "shocks the conscience" (*Hasty*, *supra*, 98 Cal.App.5th at p. 1060). The agreement's third-party provision, though one-sided and unjustified, does not rise to the same level. However, combined with the other provisions of the 2023 agreements, it shows a high degree of substantive unconscionability, and, thus, the third-party provision is unenforceable as well.

We therefore conclude that the 2023 Services Agreement injunction and the 2023 Dispute Resolution Agreement's PAGA waiver, its administrative monetary relief waiver, and the third-party provision are unenforceable due to unconscionability.

### 4. Severance

While the class action waiver implicates Barnes' attempt to bring a class action and request for relief under PAGA for his rest breaks claim, most of Barnes' claims are not impacted by the 2023 agreements' unconscionable provisions. As a consequence, LRS asked the trial court to sever those provisions and enforce the remainder of the agreements. However, finding that unconscionable provisions "permeate" the 2023 agreements, the trial court declined to sever. Reviewing this ruling for abuse of discretion (*Ramirez*, *supra*, 16 Cal.5th at p. 513), we find none.

26

As Barnes does not dispute that the unconscionability in the 2023 agreements can be cured by severance, we must assess whether the trial court abused its discretion in concluding that severance would not further the interests of justice. (*Ramirez*, *supra*, 16 Cal.5th at p. 514.) In making this assessment, we recognize "[t]he 'strong legislative and judicial preference is to sever the offending term and enforce the balance of the agreement.' " (*Id.* at p. 513.) We also recognize that the 2023 Dispute Resolution Agreement contains a severance clause, which implicitly expresses an intent that, if possible, unconscionable provisions be severed. (*Id.* at p. 517.)

Nonetheless, the trial court reasonably concluded that severance was not in the interests of justice. In this case, severance would not preserve a contractual relationship because Barnes resigned from LRS in September 2023. In addition, barring LRS from arbitrating claims against Barnes would not cause LRS an undeserved detriment because it was LRS who drafted the 2023 agreements and included in them four substantively unconscionable provisions. While there is no bright line rule concerning the number of provisions that may be severed from a contract, "the greater the number of unconscionable provisions a contract contains the less likely that severance will be the appropriate remedy." (*Ramirez*, *supra*, 16 Cal.5th at p. 517; see also *id*. at p. 516.) In addition, three of the unconscionable provisions—the injunction provision, the PAGA waiver, and the administrative monetary relief waiver—forced Barnes to relinquish significant rights, and LRS has failed to offer any reasonable business justification for these provisions. Especially in light of this failure, it is reasonable to conclude that these provisions were included solely to advantage LRS and that LRS engaged in a systematic effort to disadvantage Barnes and other employees. It would be contrary to the interests of justice to condone that effort by severing the unconscionable provisions and allowing LRS to enjoy the benefits of arbitration in spite of them. (*Id.* at pp. 516-517.) We

therefore conclude that the trial court did not abuse its discretion by refusing to sever the unconscionable provisions in the 2023 agreements.

While LRS contends that the unconscionability in the 2023 agreement can be cured through severance, it fails to explain why severance would be in the interests of justice in spite of the large number of unconscionable provisions. Indeed, LRS considered only whether it was in the interests of justice to sever one provision (the injunction provision) and thus fails to show that it is in the interests of justice to sever all four of the provisions that we have found unconscionable.

Accordingly, we conclude that the 2023 agreements are unconscionable and unenforceable.

## C. The 2021 Agreements

As noted above, before Barnes signed the 2023 Dispute Resolution Agreement and the 2023 Services Agreement, he signed two analogous agreements: the 2021 Agreement to Arbitrate and the 2022 Services Agreement. Although the 2022 Services Agreement was signed in March 2022, a little more than three months after the 2021 Agreement to Arbitrate, both agreements address dispute resolution between Barnes and LRS, and therefore we consider them together. (Civ. Code, § 1642; see also *Alberto*, *supra*, 91 Cal.App.5th at pp. 490-491.)

After concluding that the 2023 agreements were unconscionable and unenforceable, the trial court ruled that the 2021-2022 agreements were operative because the 2023 agreements substituted for the 2021-2022 agreements under the doctrine of novation and those agreements sprung back to life when the 2023 agreements were invalidated. (See Rest.2d Contracts, § 279, cmt. b ["to the extent that the substituted contract is vulnerable on such grounds as . . . unconscionability, recourse may be had on the original duty"].) This conclusion is in tension with the determination that severance is not in the interests of justice because it would reward LRS's efforts to take

advantage of Barnes and other employees.  However, we need not resolve that tension because the 2021-2022 agreements are also unconscionable and unenforceable.

### 1.  Procedural Unconscionability

The trial court concluded that the 2021-2022 agreements had a "slight degree" of procedural unconscionability because the 2021 Agreement to Arbitrate contains an opt-out provision.  We agree that the 2021-2022 agreements are procedurally unconscionable but conclude that the degree of such unconscionability is higher: modest rather than slight.

Much like the 2023 Dispute Resolution Agreement and the 2023 Services Agreement, the 2021 Agreement to Arbitrate and the 2022 Services Agreements are on pre-printed, standardized forms.  LRS, Barnes' employer, offered these agreements to Barnes as part of his employment, and the 2022 Services Agreement required Barnes to agree to the 2021 Agreement to Arbitrate and "waive[] any right to object" to that agreement.  In addition, while the 2021 Agreement to Arbitrate was only four, single-spaced pages long, it nonetheless was filled with references to state and federal statutes as well as legal terminology and requirements.  Moreover, Barnes had no more legal training or the assistance of a lawyer in 2021 and 2022 than he did in 2023.

Unlike the 2023 Dispute Resolution Agreement, the 2021 Agreement to Arbitrate did not say it was "a condition of employment."  However, on page four, under the heading "Consideration," (boldface omitted) the 2021 agreement said something similar: "Unless otherwise provided by applicable law . . . employment or continued employment with LRS shall constitute consideration and acceptance by you" of the agreement. However, in the next section under the heading "Opt Out," the 2021 agreement stated that "[a]rbitration is *not* a mandatory condition of employment.  You may opt out by mailing . . . written notice of the intent to opt out within 30 calendar day of signing this Agreement."  (Italics added, boldface omitted.)  Thus, the 2021 Agreement to Arbitrate

29

made agreement to arbitration the default, and those employees who read the agreement all the way to the end and understood it were able to opt out of it within 30 days of signing the agreement.

However, this ability to opt out of the 2021 Agreement to Arbitrate was effectively rescinded by the 2022 Services Agreement signed in March 2022. That agreement required Barnes and other employees to agree that "any potential disputes arising under this Agreement" as well as "any other aspect of Professional's employment with the Company" would be governed by the 2021 Agreement to Arbitrate executed by the Professional and to "waive[] any right to object to [the] same." Moreover, nothing in the 2022 Services Agreement acknowledges the possibility of opting out of this arbitration agreement or indicates that previous opt outs would be honored.

Focusing on the opt-out provision, LRS argues that the 2021 Agreement to Arbitrate is not a contract of adhesion because it was not offered to Barnes " 'on a take-it-or-leave-it basis.' " (*OTO*, *supra*, 8 Cal.5th at p. 126.) That was true when the Agreement to Arbitrate was signed. However, by March 2022 when the 2022 Services Agreement required Barnes to agree to arbitrate all employment-related claims under the 2021 arbitration agreement and to waive any objection to enforcement of that agreement, it was not. Thus, when the 2023 agreements were signed, and the novation of the 2021-2022 contracts occurred, the 2021-2022 agreements were contracts of adhesion.

As a consequence, while the 2021 Agreement to Arbitrate is less procedurally unconscionable than the 2023 Dispute Resolution Agreement, we nonetheless conclude that it imposed a modest degree of procedural unconscionability.

### 2. *Substantive Unconscionability*

Unlike the 2023 Dispute Resolution Agreement, the 2021 Agreement to Arbitrate does not contain an administrative monetary relief waiver. Nonetheless, the 2021-2022 agreements are substantively unconscionable. The 2022 Services Agreement contains the

30

same injunction provision as the 2023 Services Agreement, and the 2021 Agreement to Arbitrate contains an even broader PAGA waiver than its 2023 counterpart and a similar third-party provision.

### a. The Injunction Provision

The 2022 Services Agreement and the 2023 Services Agreement are largely identical. Like the 2023 agreement, the 2022 agreement prohibits employees from disclosing "Confidential Information," which is defined broadly to include all trade secrets, confidential information, and proprietary information owned by LRS as well as any third-party information LRS is obligated to maintain in confidence. In addition, like the 2023 agreement, the 2022 agreement provides that LRS may seek an injunction or any other remedy "through judicial proceedings." And the agreement requires employees to "acknowledge[] that there is no adequate remedy at law" to redress a breach of the agreement and to "waive[]" any defense that LRS "has an adequate remedy at law." Accordingly, like 2023 Services Agreement, the 2022 Services Agreement is "blatantly one-sided" and creates a "moderate level of substantive unconscionability." (*Carbajal*, *supra*, 245 Cal.App.4th at pp. 249, 253.)

### b. The PAGA Waiver

Like the 2023 Dispute Resolution Agreement, the 2021 Agreement to Arbitrate contains a PAGA waiver. However, the PAGA waiver in the 2021 agreement imposes a blanket waiver. It "waive[s] the right to commence, be a party to, participate in, receive money or any other relief from, or amend any existing lawsuit to include any representative, collective or class proceeding or claims or to bring jointly any claim covered by this agreement." It also prohibits the parties from bringing claims covered by the agreement "on behalf of other individuals or entities." Moreover, unlike the 2023 Dispute Resolution Agreement, the 2021 agreement does not provide for individual PAGA claims. As a consequence, the PAGA waiver in the 2021 Agreement to Arbitrate is

31

even more clearly legally invalid and substantively unconscionable than the waiver in the 2023 agreement.

c. <u>The Third-Party Provision</u>

The 2021 Agreement to Arbitrate contains essentially the same third-party provision as the 2023 Dispute Resolution Agreement. The 2021 agreement covers "all disputes . . . which LRS may have against you [Barnes] or you may have against LRS, its affiliates, subsidiaries, divisions, predecessors, successors, assigns and their current and former employees, officers, directors, and agents . . . ." However, just like the 2023 agreement, the 2021 agreement does not provide for arbitration of claims that LRS's affiliates and other third parties listed in the agreement may have against Barnes. As a consequence, like the 2023 Dispute Resolution Agreement, the 2021 agreement's third-party provision lacks mutuality and is substantively unconscionable. (*Cook*, *supra*, 102 Cal.App.5th at pp. 327-328.)

### 3. *Enforceability*

Because the 2021-2022 agreements have a modest level of procedural unconscionable, more than a moderate level of substantive unconscionability is needed to render the agreement's provisions unconscionable and unenforceable. (See, e.g., *Carbajal*, *supra*, 245 Cal.App.4th at p. 253.) As with the 2023 agreements, the one-sided injunctive relief provision in the services agreement has at least a moderate level of substantive unconscionability. (See *id.* at p. 253; see also *Alberto*, *supra*, 91 Cal.App.5th at p. 495.) In addition, the blanket PAGA waiver in the 2021 Agreement to Arbitrate has a "high degree of substantive unconscionability." (*Alberto*, at p. 495.) And, combined with the injunction provisions and the PAGA waiver, the 2021 agreement's third-party provision shows a high degree of substantive unconscionability. (*Cook*, *supra*, 102 Cal.App.5th at p. 321.) As a consequence, the injunction provision, PAGA waiver, and third-party provision in the 2021-2022 agreements are unconscionable and unenforceable.

### 4. *Severance*

Finally, the trial court did not abuse its discretion in concluding that it is not in the interest of justice to sever the unconscionable provisions in the 2021-2022 agreements. As with the 2023 agreements, severance would neither conserve a contractual relationship nor cause LRS an undeserved detriment. In addition, while there are only three unconscionable provisions in the 2021-2022 agreements, the waiver of an essential requirement for injunctive relief and the PAGA waiver both forced Barnes to relinquish significant rights without reasonable justification. Even more important, inclusion of similar provisions in the 2023 agreement as well as the administrative monetary relief waiver shows a systematic effort to take advantage of Barnes and other employees, which should not be condoned by severing the unconscionable provisions and allowing LRS to compel arbitration. (*Ramirez*, *supra*, 16 Cal.5th at p. 517.) As a consequence, the trial court did not abuse its discretion in concluding that it is not in the interests of justice to sever the unconscionable provisions in the 2021-2022 agreements.

Accordingly, we conclude that the 2021-2022 agreements, like the 2023 agreements, are unconscionable and unenforceable and that the trial court properly denied LRS' motion to compel arbitration and to dismiss the class action claims.

### III. DISPOSITION

The order dated March 24, 2025 denying the motion to compel arbitration is affirmed. Respondent is awarded costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

_____
BROMBERG, J.

WE CONCUR:

_____
DANNER, ACTING P. J.

_____
CHUNG, J.*

Barnes v. LRS Healthcare, LLC
H053238

_____

* Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.